Wilson, J.
***567 Defendant Jaime Lopez-Mendoza challenges his conviction of first-degree rape on two grounds: (1) he was denied the effective assistance of counsel because his trial attorney failed to review, or failed to comprehend the significance of, surveillance video evidence contradicting his grand jury testimony of a consensual sexual encounter with the victim, and therefore proceeded at trial as if the grand jury testimony were true; and (2) the introduction of DNA evidence violated his Sixth Amendment rights, because the analyst who testified at trial did not generate the DNA profile taken from his buccal swab. On the present record, defendant has not carried his burden of demonstrating ineffective assistance of counsel and the introduction **268 *864 of the DNA evidence was harmless even if erroneous. We therefore affirm.
I.
A young couple drove to Manhattan on the day after Christmas, 2009. They checked into room 205 of a hotel at 7:14 PM. After a night out with friends in New York City, they returned to their hotel at 2:37 AM on December 27. Intoxicated, they were unable to unlock the door to their room. Mr. ***568 Lopez-Mendoza, a hotel employee, appeared and opened the door using one of their card keys. According to the couple, they both passed out on top of the hotel bed almost immediately. According to the victim, she was awakened by a person having sexual contact with her. She thought it was her boyfriend and stopped the encounter. She was again awakened during the act of sexual intercourse. Realizing the person was not her boyfriend, who was still asleep next to her in the bed, she began screaming. She testified seeing a bump under the covers and a figure, low to the ground, scuttling out of the room. Her screams awakened her boyfriend. After the victim dressed, the pair bolted into the hallway. They saw no one. Believing her assailant was next door in room 206, the victim pounded on that door, still screaming. At 3:40 AM, the hotel sent a security guard to the second floor in response to noise complaints. Several minutes later, the hotel sent Mr. Lopez-Mendoza to assist the guard. When Mr. Lopez-Mendoza appeared, the victim identified him as her attacker, which resulted in a further disturbance. Both the hotel personnel and the victim called 911. The police responded.
When first interviewed by a police officer, Mr. Lopez-Mendoza said that he had assisted the couple to enter their room, and no more. The police officers left, and Mr. Lopez-Mendoza continued his shift at work. The officers returned, and one officer interviewed Mr. Lopez-Mendoza at 6:15 AM, obtained his work uniform (which he had placed in a laundry bin), and asked him to tell the truth. Mr. Lopez-Mendoza told the officer that "he had sex with her but didn't force himself on her." The officers arrested him.
Two days later, Mr. Lopez-Mendoza executed a waiver of immunity pursuant to CPL 190.45 and testified voluntarily before a grand jury, in the presence of his attorney. Mr. Lopez-Mendoza testified in great detail as to the events at the hotel, saying that just after he opened the couple's room door for them, he and the woman, at her insistence, had consensual sex on the bed where her boyfriend lay sleeping. Both the prosecutor and the grand jurors had questions for Mr. Lopez-Mendoza, and he reiterated this version of the events several times, adding details about his use and disposal of a condom.
At some point after his grand jury testimony and before trial, the People delivered to defense counsel a substantial volume of hotel surveillance video. The hotel had surveillance video of the ground floor and lower levels but not of the guestroom ***569 floors. The surveillance video shows that the couple entered the hotel lobby at 2:37 AM. The hotel's computer records show that the room's lock was opened at 2:38 AM. The video also shows that Mr. Lopez-Mendoza exited the basement elevator at 2:40 AM, went to the utility area and left through the employees' entrance, returning through the lobby at 2:42 AM to get an umbrella from the front desk, and then exited the hotel. It then shows him returning to the hotel at 3:09 AM through the employees' entrance, going to the men's locker room, and entering the service elevator at 3:11 AM. At 3:38 AM, the video shows him exiting the service elevator **269 *865 and taking a large garbage bag to the laundry area.
DNA from saliva recovered from the victim's breast matched Mr. Lopez-Mendoza's, but the vulva swabs did not contain his DNA. Defendant was indicted for the crimes of rape in the first degree, criminal sexual act in the first degree, and two counts of sexual abuse in the first degree on the theory that the sexual acts were nonconsensual due to the physical helplessness of the victim.
Approximately a month before trial, the People advised defense counsel that surveillance video evidence demonstrated the falsity of Mr. Lopez-Mendoza's grand jury testimony. The parties agree that the video demonstrates that Mr. Lopez-Mendoza's grand jury testimony is false, because he could not have had sex with the complainant within the three minutes between the couple's entry into the hotel lobby on the way to their room and Mr. Lopez-Mendoza's exiting the elevator in the basement.
In his opening, defense counsel nevertheless hewed to the timeline his client had given to the grand jury, advising the jury that it would "learn from the defendant that [the victim] appeared to be in an amorous mood ... starts suggesting to him that he should come into the room ... and starts taking some clothing off." Mr. Lopez-Mendoza bases his ineffective assistance claim on the premise that his trial counsel's opening statement proves that counsel did not review the video evidence or did not understand its importance.
Mr. Lopez-Mendoza points to a mid-trial colloquy that, he asserts, bears on the question of whether defense counsel had seen the video evidence. The People sought to introduce excerpts of the surveillance video that had been compiled from 26 surveillance cameras stationed around the hotel's ground ***570 floor and basement level. Defense counsel objected, and a discussion ensued. When defense counsel said that he "would like to have the Court review the videos first before making any decision about whether they are even admissible and what they show," the Court asked, "Have you seen the video?" Counsel responded: "Yes. I was never given these particular - I mean, I have like a hundred gigabytes of video, and I ask[ed] for the relevant information." The Court then asked, "Did you receive the videotapes or not?" Counsel responded, "It's not a tape it's a hard drive with over a hundred gigabytes." The colloquy continued:
THE COURT: That's not my question. My question is, did you receive it?
COUNSEL: I didn't see what [the prosecutor is] talking about.
THE COURT: My question is, did you receive it?
COUNSEL: I received a hard drive with a huge amount of material equivalent to maybe a hundred movies.... I would like to know in advance which cameras and which time periods [the prosecutor is] talking about.
The People confirmed that the entirety of the surveillance video had been turned over to the defense, so that everything the People intended to play for the jury was within defense counsel's possession. Then, the People stated: "He should have watched the videos, especially in light of the fact that we had a bench conference, and I told him that I saw it, that his grand jury testimony was not accurate, was not truthful because we saw the defendant in these other areas when he was supposedly having sex with the victim." Immediately after that statement, the Court asked defense counsel whether he had received the entirety of the surveillance video, and defense counsel confirmed that he had. The **270 *866 record does not contain confirmation or denial of the People's implied accusation that defense counsel did not watch the video.
The People subsequently introduced into evidence portions of the surveillance video, undermining the version of events Mr. Lopez-Mendoza related in his grand jury testimony, and which defense counsel recited in his opening statement. After the People rested, defense counsel advised the Court that "after ***571 continued reflection overnight, confirmed this morning, my client will not testify." The Court then advised Mr. Lopez-Mendoza that the choice to testify was "yours not [counsel's]," and that if he chose not to testify "I will instruct the jury they cannot hold that against you; no adverse inference will be taken." Mr. Lopez-Mendoza told the Court that he did not want to testify.
In summation, defense counsel attacked the complainant's version of events and argued a version of the facts that was inconsistent with what he described in his opening. He attacked the videotape evidence on two grounds: (1) although it showed the defendant entering the basement at 3:11 and 3:38, both times he was in the basement coming from the same direction, and the video never shows him leaving the basement in-between, so Mr. Lopez-Mendoza could not have been the attacker if it occurred within that time frame; and (2) if the attack occurred between 2:37 and 2:40, it could not be anything like the incident the complainant described. It would have had to be a momentary encounter only long enough to allow for finding Mr. Lopez-Mendoza's saliva on her breast. He further argued that a shorter encounter would have been consistent with Mr. Lopez-Mendoza's statement to police that the encounter was consensual, as that statement did not describe the sexual encounter in any detail. He also called an Emergency Medical Technician who attended to the victim at the scene; the EMT testified that the victim had said that the attack occurred "moments" after Mr. Lopez-Mendoza helped her open the door to the hotel room. Defense counsel also called investigators who testified that they had tested the door to room 205 and determined that it closed and locked when released. The jury convicted Mr. Lopez-Mendoza of first-degree rape and acquitted him of the criminal sex act charge.
II.
"In determining whether counsel provided effective assistance, the core of the inquiry is whether defendant received meaningful representation. In making that assessment, the court must view counsel's performance in its totality" ( People v. Wragg, 26 N.Y.3d 403, 409, 23 N.Y.S.3d 600, 44 N.E.3d 898 [2015] ). Mr. Lopez-Mendoza argues that his attorney's opening statement undermined his case by promising the defendant would take the stand and making arguments contradicted by video evidence, then failing to call defendant to the stand and closing with a new version of ***572 events. The ineffective assistance, he argues, was caused by either his attorney's failure to review the video evidence or his failure to understand its importance. Either way, Mr. Lopez-Mendoza contends, that failure proved disastrous.
The defendant "bears the ultimate burden of showing ... the absence of strategic or other legitimate explanations for counsel's challenged actions" ( People v. Clark, 28 N.Y.3d 556, 563, 46 N.Y.S.3d 817, 69 N.E.3d 604 [2016] [internal quotation marks omitted] ). The record here is insufficient to make that showing. Although "[i]t simply cannot be said that a total failure to investigate the facts of a case, or **271 *867 review pertinent records, constitutes a trial strategy resulting in meaningful representation" ( People v. Oliveras, 21 N.Y.3d 339, 348, 971 N.Y.S.2d 221, 993 N.E.2d 1241 [2013] ), the limited record in this case does not conclusively establish that counsel was ineffective. On its own, the decision not to call a witness after promising to do so does not establish ineffective assistance of counsel as a matter of law ( People v. Benevento, 91 N.Y.2d 708, 714-715, 674 N.Y.S.2d 629, 697 N.E.2d 584 [1998] ).
Further, on this record, defendant has failed to demonstrate that he otherwise was denied meaningful representation. The video evidence demonstrated the falsity of defendant's grand jury testimony. We do know that the jury never learned of Mr. Lopez-Mendoza's grand jury testimony and that he was never subjected to cross examination with it. Instead, counsel elicited testimony from the EMT that the victim stated the assault occurred "moments" after the victim entered her hotel room, which was inconsistent with the People's theory that the assault happened between 3:11 and 3:38. But on the present record, we cannot determine whether the above was part of a strategy employed by counsel, because the present record does not address defense counsel's strategic trial decisions, if any. The colloquy concerning defense counsel's viewing of the surveillance video is inconclusive: counsel answered the Court that he had "seen" the video, though it is certainly possible that he had not seen it, had not seen the right portions of it, or misunderstood its import despite a warning from the People a month earlier. The colloquy was not directed at whether defense counsel had reviewed the video, but rather whether he was entitled to review the People's compilation of excerpts from the video before they were introduced into evidence. Because the question of whether counsel viewed the entirety of the surveillance footage was never addressed head on, the record does not indicate whether defense counsel reviewed the video before determining a trial strategy. Accordingly, we cannot ***573 determine whether, before trial, counsel reviewed and understood the import of the video evidence. Moreover, it is also possible - and undeterminable on this record - that defendant, having heard the trial evidence, himself decided not to testify.
"[T]he lack of an adequate record bars review on direct appeal ... wherever the record falls short of establishing conclusively the merit of the defendant's claim" ( People v. McLean, 15 N.Y.3d 117, 121, 905 N.Y.S.2d 536, 931 N.E.2d 520 [2010] ). Here, it is "essential[ ] that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10" ( People v. Brown, 45 N.Y.2d 852, 853-854, 410 N.Y.S.2d 287, 382 N.E.2d 1149 [1978] ). Such a proceeding could answer the questions left open on this record, including whether counsel reviewed the video evidence at all, or whether he may have misunderstood that the evidence was flatly inconsistent with his opening argument.
III.
Defendant also argues the introduction of DNA evidence at trial violated the Sixth Amendment (see People v. John, 27 N.Y.3d 294, 33 N.Y.S.3d 88, 52 N.E.3d 1114 [2016] ). Here, the issue was whether the victim consented to sexual contact with defendant; identification was not at issue. Because the DNA evidence did not go to the determinative issue of consent, any error in admitting it was harmless.
The order of the Appellate Division should be affirmed.