# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 25
The People &c.,
     Respondent,
   v.
Robert Maffei,
     Appellant.

David P. Greenberg, for appellant.
Ann Bordley, for respondent.

DiFIORE, Chief Judge:

In this direct appeal, defendant claims he was denied the effective assistance of counsel based on a single purported error – counsel's failure to challenge a prospective juror. We agree with the Appellate Division that defendant, on this record, has not

sustained his burden to establish that counsel was constitutionally ineffective. Therefore, the appropriate procedure for the litigation of defendant's challenge to his counsel's performance is a CPL 440.10 motion – the very mechanism designed by the Legislature to enable review of factual issues dehors the record. Accordingly, we affirm the order of the Appellate Division.

In May 2003, the victim, the rear passenger in a vehicle, was shot in the head and killed in a drive-by shooting. Defendant was indicted in 2006 and charged with depraved indifference murder, among other charges. Over two years later, defendant's trial commenced. In the first round of jury selection, the trial court questioned prospective juror number 10, who stated that his uncle and cousin were law enforcement officers in Puerto Rico and that, several years earlier, he was charged with marijuana possession and performed community service as a result. When asked by the court whether the latter experience would cause him to be unfair, he responded, "[n]o, not at all."

The prosecutor, at the outset of his voir dire in round one, asked the prospective jurors to raise their hand if they could not be fair and render a verdict after "listen[ing] to the evidence." He summarized the facts of the case and began asking prospective jurors whether anything in their background would cause them to question whether they could be impartial. After one juror responded that his sister had been the victim of a random shooting, the prosecutor asked if "[a]nyone ha[d] a similar situation . . . with something in [their] past[.]" Prospective juror number 10 requested to speak, and the following exchange ensued:

"PROSPECTIVE JUROR: I think I read about this in the papers.

PROSECUTOR: This case did receive publicity.  Go ahead, sir.

PROSPECTIVE JUROR: To be honest with you, I remember reading.  Kind of made up my mind then.

PROSECUTOR: Kind of made up your mind then?

PROSPECTIVE JUROR: Didn't like the circumstances. I remember reading about it, making a decision kind of in my own head at that time.

PROSECUTOR: You understand it's up to me now to prove to you, beyond a reasonable doubt, who is the actual person that actually did it, right?

PROSPECTIVE JUROR: Right.

PROSECUTOR: You might have made up your mind. I believe that was a really bad act. I didn't like the way it happened.  Do you understand I have to prove who did it?

PROSPECTIVE JUROR: Yes."

The trial court explained that the jury would be instructed to avoid media coverage of the case, further commenting,

"As [prospective juror number 10] indicated, he said he made up his mind.  That is a bad thing.  Obviously, someone was arrested.  There's nobody here who is in favor of someone being shot to death in most circumstances.  What is important is that it's this defendant who is charged with that crime.  The burden lives with [the prosecutor].  That he has to prove that this is the person who did that.  Okay?  You can remain fair and impartial?"

Prospective juror number 10 responded, "I hope so," prompting the trial court to remind him of the need to answer unequivocally, to which he twice responded, "I'm not sure."

The prosecutor explained that the depraved indifference murder charge implicates the same punishment as an intentional crime, despite requiring only proof of recklessness. In response to questioning about that charge, prospective juror number 10 stated, "I feel if it's a good case, I'll go by the law."  The prosecutor then asked whether prospective juror

number 10 felt he was treated fairly in connection with his prior marijuana arrest, and he answered that he was treated fairly "[a]t one point" but not at "[t]he time [he] was arrested," but denied he remained angry about the experience. When questioned about his relatives in law enforcement, he asserted he did not speak with them about their cases and that he would judge police "[a]s anyone else."

Defense counsel then conducted his portion of the voir dire, asking questions of prospective jurors, both individually and collectively as a group, including whether any of them would have difficulty presuming defendant innocent, were exposed in their personal lives to law enforcement, had particularized knowledge about handguns, or would require defendant to testify in order to acquit. He directly asked four unnamed prospective jurors whether they would be able to acquit if the People presented insufficient evidence, and all four answered affirmatively. He concluded by asking the panel to answer, by way of show of hands, whether he had their assurance that if "you, as an individual, do not believe that the District Attorney has proven this case to you beyond a reasonable doubt" they could "stick to the courage of [their] convictions" as the lone holdout voting for acquittal, and whether they were each "accountable to the job" of serving on the jury and by urging them to notify him if there was anything further they wanted to discuss.

At the close of round one, the trial court excused six prospective jurors for cause on consent of the parties based on their answers during voir dire, including two prospective jurors who did not raise their hands to group questions posed by defense counsel. Neither counsel made any individual challenges for cause. The prosecutor then exercised three

peremptory challenges. Defense counsel, before exercising defendant's peremptory challenges, asked the court for a moment to confer with defendant off the record and then, after a pause in the proceeding, exercised three peremptory challenges. The clerk read the names of the four remaining prospective jurors – including prospective juror number 10 – and defense counsel responded that "[t]hose four will do." Prospective juror number 10 was seated as a juror. At the close of jury selection, defendant had several peremptory challenges remaining.

Defendant was convicted, upon a jury verdict, of second-degree murder. At sentencing, the trial court commented on the high quality of advocacy by the prosecutor and defense counsel. On direct appeal, defendant argued that his trial counsel's failure to challenge prospective juror number 10 constituted ineffective assistance of counsel. The Appellate Division affirmed (165 AD3d 1173 [2d Dept 2018]). In rejecting the ineffective assistance of counsel claim, the court reasoned that it was based in part on matters dehors the record and that "a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety" (id. at 1174). A Judge of this Court granted defendant leave to appeal (32 NY3d 1174 [2019]).

Defendant raises an ineffective assistance of counsel claim under the New York and federal constitutions based on a single alleged error: failure to challenge prospective juror number 10. Under both the New York and federal standards, defendant bears the burden of establishing that counsel's performance was constitutionally deficient (People v Campbell, 30 NY3d 941, 942 [2017], citing People v Nicholson, 26 NY3d 813, 831

[2016]). The constitutional guarantee of effective assistance of counsel is met where a defendant was afforded "meaningful representation" based on "the evidence, the law, and the circumstances of [the] particular case, viewed in totality and as of the time of the representation" (People v Benevento, 91 NY2d 708, 712 [1998], quoting People v Baldi, 54 NY2d 137, 147 [1981]). To prevail on an ineffective assistance claim, a defendant must "demonstrate the absence of strategic or other legitimate explanations" – i.e., those that would be consistent with the decisions of a "reasonably competent attorney" – for the alleged deficiencies of counsel (Benevento, 91 NY2d at 712 [citations omitted]). A single error can constitute ineffective assistance, "but only when [it] is sufficiently egregious and prejudicial as to compromise a defendant's right to a fair trial" (People v Caban, 5 NY3d 143, 152 [2005] [citations omitted]; see also Harrington v Richter, 562 US 86, 111 [2011]).

"Generally, the ineffectiveness of counsel is not demonstrable on the main record" but rather requires consideration of factual issues not adequately reflected on that record (People v Brown, 45 NY2d 852, 853 [1978]; see also People v Harrison, 27 NY3d 281, 289 [2016]). By codifying the writ of error coram nobis in CPL article 440, the Legislature crafted a procedure for such scenarios. To that end, article 440 permits defendants to complete the record by putting forth sworn factual allegations in support of a motion to vacate the judgment of conviction and authorizes evidentiary hearings on those motions (CPL 440.10, 440.30), thereby providing a vehicle specifically for the investigation of claims dependent on matters dehors the direct record (see CPL 440.10[2][c] [requiring denial of a motion to vacate if "sufficient facts appear on the (direct) record . . . to have

permitted . . . adequate review" of the claim on direct appeal but defendant unjustifiably failed to perfect the appeal]). Such investigations are vital to a defendant's claim when the record on direct appeal is inadequate to permit the reviewing court to determine whether there was an error that deprived the defendant of the constitutional right to a fair trial. Thus, although there may be some cases in which the trial record is sufficient to permit a defendant to bring an ineffective assistance of counsel claim on direct appeal (see People v Nesbitt, 20 NY3d 1080, 1081-1082 [2013]), "in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10" (Brown, 45 NY2d at 853-854; see also Campbell, 30 NY3d at 942-943). That is especially true as to ineffective assistance of counsel claims based on the defense's acceptance of a prospective juror. Counsel's decisions during jury selection may be based on a myriad of factors, including not only the prospective jurors' statements or actions reflected in the record, but also matters dehors the record on the direct appeal.

Nonetheless, defendant argues that the voir dire record reveals that prospective juror number 10 harbored an actual bias against him, citing the juror's statements that, upon reading pretrial publicity about the case, he "made up [his] mind then" that he "[d]idn't like the circumstances," as well as his failure to unequivocally guarantee that he could be impartial when the trial court questioned him immediately following those statements. Defendant asserts that the alleged error, by violating his right to a fair trial, is sufficiently egregious to constitute ineffective assistance standing alone.

An actual bias is one that precludes a juror from rendering an impartial verdict based upon the evidence adduced at trial (CPL 270.20[1][b]; see Murphy v Florida, 421 US 794, 799-802 [1975]; see also People v Torpey, 63 NY2d 361, 366 [1984]).  A determination of whether jurors lack the ability to be impartial turns on whether, based on the totality of the voir dire record, it is evident that a preference for one side over the other would impact their decision-making (see Murphy, 421 US at 800-802; see also Patton v Yount, 467 US 1025, 1033-1040 [1984]; People v Johnson, 94 NY2d 600, 614-616 [2000]).  Thus, "[w]e have consistently held that 'a prospective juror whose statements raise a serious doubt regarding the ability to be impartial must be excused [by the trial court] unless the juror states unequivocally on the record that he or she can be fair and impartial'" (People v Harris, 19 NY3d 679, 685 [2012], quoting People v Chambers, 97 NY2d 417, 419 [2002]).  In the context of pretrial publicity in a case, a juror who reads about a crime in the news must be able to "lay aside his [or her] impression or opinion and render a verdict based on the evidence," but it is not necessary that jurors "be totally ignorant of the facts and issues involved," particularly "[i]n these days of swift, widespread and diverse methods of communication," and it should be expected that jurors will have "formed some impression or opinion as to the merits" (Irvin v Dowd, 366 US 717, 722-723 [1961]; see also People v Cahill, 2 NY3d 14, 38-40 [2003]).

We reject defendant's argument here that prospective juror number 10's statements during voir dire reflect actual bias against defendant predicated on any evidence precluding the juror from rendering an impartial verdict, as opposed to general discomfort with the

case based on media coverage.  Contrary to defendant's assertion, the juror's verbatim

statements did not reveal what about the case gave rise to his uneasiness – whether it be

the seemingly random nature of the shooting, the defendant's or victim's identity, or the

manner in which the police investigated.[1]  Nor did this juror convey that his uneasiness

was connected to any particular personal experience or relationship,[2] or whether his

impressions risked predisposition toward the prosecution or defense.  Moreover, as both

the prosecutor and trial court indicated in questioning the juror, this case turned not on a

dispute about the nature of the crime but on the prosecutor's ability to prove that this

defendant committed it – an issue not impacted by the juror's apprehension.

---

[1] The dissent's reliance, in concluding that the juror communicated bias against defendant, on improper fact-finding concerning the media reports about this case and inferences drawn from statements made by the court and prosecutor underscores the need for evidentiary exploration in the context of a CPL 440.10 motion in order to sustain defendant's claim (see dissenting op at 3 n 1, 4 n 2, 14-15).

[2] Defendant's reliance on Miller v Webb (385 F3d 666 [6th Cir. 2004]), which held that counsel's failure to challenge a biased juror amounted to ineffective assistance under federal law, is inapposite.  Critically, that case involved a fact-finding evidentiary hearing on the defendant's motion to vacate his conviction, which explored counsel's strategy concerning the juror and enabled the Sixth Circuit to review that decision (id. at 669-670, 676).  In addition, there, actual bias was undeniable, as the juror was personally acquainted with the victim and key prosecution witness (id. at 668-669, 674-675).  Hughes v U.S. (258 F3d 453 [6th Circuit 2001]), cited in Miller, is also distinguishable.  There – a case involving theft of a federal marshal's property – the juror expressed bias in favor of law enforcement based on personal relationships with police, and the court relied largely on counsel's and the trial court's complete failure to ask her any follow-up questions in holding that the juror was actually biased and counsel was ineffective (id. at 456, 458-459). The record here demonstrates that defense counsel and the trial court conducted follow-up questioning of this prospective juror.

Pivotally, where no actual bias is evidenced on this record, additional statements by the prospective juror and matters outside of the record could have provided defense counsel with reasons to retain the juror. First, although prospective juror number 10 initially equivocated when asked if he could be fair and impartial, that exchange occurred early in the voir dire and was followed by a substantial discussion as to whether the prospective jurors were fit to serve, during which he stated that he could "go by the law" concerning depraved indifference murder if he felt it was a "good case" and that he would view police testimony just as any other. Second, the record does not reveal the identity of the four prospective jurors who individually answered affirmatively when defense counsel asked them whether they could acquit if the People presented insufficient evidence. Defendant, in the absence of any challenge to the juror in question in the trial court, does not get the belated strategic benefit of his silence by now arguing on direct appeal, without support in the record, that prospective juror number 10 was not one of them. Third, defense counsel asked collectively several questions to the prospective jurors framed to uncover bias against defendant and, although other jurors were excused for cause on consent based on their negative responses to these questions by failing to raise their hands, this juror evidently answered in the affirmative. When viewed in totality, the voir dire record – reflecting only the juror's generalized discomfort based on media coverage and a lack of clarity regarding his subsequent answers – "does not show a substantial risk that the prospective juror would not properly discharge his responsibilities, nor does it cast doubt on his ability to be fair" (People v Barboni, 21 NY3d 393, 407 [2013]).

Additionally, the record is silent as to what was said between defendant and his counsel during the conference immediately before counsel informed the court of his peremptory strikes. A defendant's fundamental right to be present during the voir dire of prospective jurors is predicated on the right to personally assess the "facial expressions, demeanor and other subliminal responses" of potential jurors in order to choose his or her jury (People v Antommarchi, 80 NY2d 247, 250 [1992], quoting People v Sloan, 79 NY2d 386, 392 [1992]). A defendant's views at trial about a prospective juror as conveyed to counsel are relevant to an ineffectiveness claim based on the joint decision to accept that juror. Here, where we do not know what was said between defendant and his counsel or how that conversation may have affected counsel's impression of prospective juror number 10, the ineffective assistance claim cannot be resolved on direct appeal.

Defendant's argument that counsel's decision not to challenge the juror is rendered constitutionally defective by the lack of an unequivocal assurance of impartiality by the juror on the voir dire record – like that required to uphold a trial court's denial of a defendant's for-cause challenge to a juror who has revealed a state of mind likely to preclude impartial decision-making (see Johnson, 94 NY2d at 614) – is misplaced. To be sure, we have recognized that the use of the type of collective question-and-answer techniques employed by defense counsel in this case does not provide an unequivocal statement of impartiality sufficient to avoid a meritorious for-cause challenge where the juror has previously demonstrated partiality (see People v Arnold, 96 NY2d 358, 363-364 [2001]). However, it does not follow that defense counsel is constitutionally ineffective

for failing to challenge a juror after generally asking such questions of the entire venire, and receiving satisfactory answers. A defendant's challenge for cause of a prospective juror irrefutably demonstrates that defendant did not accept the juror. Accordingly, the propriety of the trial court's decision to deny such a defense challenge turns entirely on the juror's responses on the voir dire record (see e.g. id. at 363-364). By requiring an unequivocal assurance of impartiality to empanel a juror over a for-cause challenge, we have encouraged courts to err on the side of granting such challenges, observing that "[t]he 'worst the court will have done in most cases is to have replaced one impartial juror with another impartial juror'" (Johnson, 94 NY2d at 616, quoting People v Culhane, 33 NY2d 90, 108 n 3 [1973]). However, where – as here – the defense may have wanted the prospective juror to sit on the jury, the court does not have room to err on the side of caution in that way without risking impingement of the defendant's right to choose his or her jury. For these reasons, defendant has failed to demonstrate, on this record, "the absence of strategic or other legitimate explanations" for counsel's alleged error (Barboni, 21 NY3d at 405-406, see People v Sposito, 30 NY3d 1110, 1111 [2018]).

Not only is this record silent concerning what, if anything, defendant conveyed to counsel during their conference in reference to this prospective juror, but the voir dire record as a whole is also inadequate to support anything more than second guessing the reasonableness of counsel's decision. In this case, where the trial record does not reveal that the juror was actually partial to one side, defendant cannot use the absence of a challenge to the juror in question to now argue that counsel was ineffective on an

incomplete record.  A CPL 440.10 motion is the proper mechanism for the litigation of the claim.

Accordingly, the order of the Appellate Division should be affirmed.

People v Robert Maffei

No. 25

RIVERA, J. (dissenting):

A defendant has a constitutional right to be tried by an impartial jury (Duncan v

Louisiana, 391 US 145, 153, 162 [1968]; People v Torpey, 63 NY2d 361, 365 [1984]).

Every defendant also has a right to effective assistance of counsel (Strickland v

- 1 -

Washington, 466 US 668, 686 [1984]; People v Ortiz, 76 NY2d 652, 655-656 [1990]). And under our legal system, a defendant is entitled to effective assistance of counsel from a defense attorney who acts to protect those rights in accordance with professional standards of competence when selecting among prospective jurors (CPL 170.10 [3]; see Strickland, 466 US at 690; Gray v Mississippi, 481 US 648, 671 [1987] [Powell, J. concurring]; People v Clark, 28 NY3d 556, 563 [2016]; People v Colon, 90 NY2d 824, 826 [1997]; American Bar Association ("ABA") Standards for Criminal Justice, Defense Function, Standards 4-1.2 [c], 4-7.3 [a] [4th ed 2017]).

Defendant was deprived of meaningful representation when his trial counsel did not challenge a prospective juror who was unable on multiple occasions to state unequivocally that he could be fair and impartial, including twice in response to direct questioning from the judge. Counsel's actions cannot be explained as part of a reasonable trial strategy because the prospective juror never disavowed those statements or explained how he could overcome his admitted emotional reaction to the crime. As a result of counsel's failure, defendant was tried by at least one juror who was unsure if he could fairly evaluate the evidence against defendant. That error of constitutional dimension warrants reversal and remittal for a new trial.

I.

A.  The Fatal Shooting

Defendant Robert Maffei was prosecuted for having shot and mortally wounded a passenger in a moving vehicle. According to the evidence presented by the prosecution,

defendant was riding in his female friend's car on the highway late at night when he shot into the rear of another car, apparently motivated by jealousy. He did not know anyone in the other car and shot after some of the men smiled and waved at defendant's friend, with whom defendant had a casual romantic relationship, and another female passenger and commented on their beauty. The men in the other car drove to the hospital where the victim was declared brain dead and passed away after the family terminated life support. The shooting was an unprovoked act of violence that resulted in the killing of a young man by another young man. Senseless. The type of act that evokes anger and a desire for justice for the victim and the victim's family. Unsurprisingly, there was media coverage of the crime.[1]

---

[1] The media coverage immediately following the murder focused heavily on the circumstances of the shooting (Melissa Grace, *DRIVE-BY KILLER HUNTED Teen shot as he rides with pals in 2nd car*, NY Daily News, June 9, 2003, https://www.nydailynews.com/archives/boroughs/drive-by-killer-hunted-teen-shot-rides-pals-2nd-car-article-1.673575; Tamer El-Ghobashy and Alice Mcquillan, *On Highway, A Stolen Glance & A Forfeit Life*, NY Daily News, May 19, 2003, https://www.nydailynews.com/archives/news/highway-stolen-glance-forfeit-life-article-1.672358; Lorena Mongelli, *Car Ogle Deadly For Teen*, NY Post, May 19, 2003, https://nypost.com/2003/05/19/car-ogle-deadly-for-teen/; Shaila K. Dewan, *Metro Briefing | New York: Brooklyn: Man Is Fatally Shot*, NY Times, May 19, 2003, https://www.nytimes.com/2003/05/19/nyregion/metro-briefing-new-york-brooklyn-man-is-fatally-shot.html?searchResultPosition=1; *Police Have Possible Motive In Fatal Brooklyn Highway Shooting*, NY1 News, May 19, 2003, https://www.ny1.com/nyc/all-boroughs/archives/2003/05/19/police-have-possible-motive-in-fatal-brooklyn-highway-shooting.NYC_30336; *Police Release Photo Of Car Believed To Be Involved In Deadly Highway Shooting*, NY1 News, June 10, 2003, https://www.ny1.com/nyc/all-boroughs/archives/2003/06/10/police-release-photo-of-car-believed-to-be-involved-in-deadly-highway-shooting.NYC_30906). In particular, the coverage stressed that shooting may have been the result of jealousy after the victim and other passengers in the car made comments about or glances at the females in the car in which defendant was traveling. Further, the media noted favorable details about the victim, including that he was a college student at Lincoln Tech with a 4.0 GPA and that his prior arrest was likely a case of

For over two years, the police were unable to identify the shooter, until finally they got a lead on the two women who were in the car with defendant, and who told the police about the shooting. Thereafter, the police arrested defendant. Another round of press coverage followed.[2]

The prosecutor presented testimony from witnesses in the other car, who described the highway shooting and driving the victim immediately to the hospital, and the females in the car from which the fatal gunshot was fired, who recounted how defendant shot into that other car as they drove by and then threatened both of them to convince them not to report him, as well as evidence concerning the police investigation of the shooting and the victim's car. The defense theory was that if the defendant shot at the car, he missed, and the victim was fatally shot by someone other than defendant later that night. In support of this view of the evidence, counsel argued the People's witnesses were not credible, and the police were standing by, if not wholly covering up, a poor investigation.

---

mistaken identity. When the police were asking for leads in the shooting during the two-year period in which the case went "cold," the follow-up media coverage focused on the circumstances of the shooting, how the shooting may have stemmed from "lustful glances," and the devastating impact of the victim's death on his family (see, e.g., Jotham Sederstrom, *Cops seek help in old murder*, The Brooklyn Paper 15, May 22, 2004, https://www.brooklynpaper.com/assets/pdf/27_20bp.pdf).

[2] Once defendant was arrested and charged with the victim's death, the news coverage summarized the circumstances of the crime; noted how defendant was charged with murder and manslaughter charges; highlighted how defendant was transferred to Brooklyn from a prison in New Jersey where defendant was serving time for an unrelated conviction; and documented the victim's mother's emotional reaction at the arraignment of defendant (see, e.g., Larry Celona, "Jailed Con Nailed in Teen's '03 Belt Parkway Shoot Slay," NY Post, Sept 16, 2006, https://nypost.com/2006/09/16/jailed-con-nailed-in-teens-03-belt-parkway-shoot-slay/).

### B.  Jury Selection

During examination of the first panel of prospective jurors at defendant's trial, the court presented jurors with a life and death metaphor to emphasize that the court needed definitive statements that they could be impartial:

> "Suppose that you have been flying in an airplane. You are getting close and the pilot gets up and says, ladies and gentlemen, we are five minutes to landing. Please fasten your seatbelts. I think I can do this. We don't want to hear that on the plane…[F]or legal reasons I need to hear from a juror I can be fair and impartial. I can do this. It's very normal for someone to say, do you think you can do this? Yes, I can do this. That's a normal answer. But because things change when you walk into a courtroom, they have to be a little more definitive."

Against that backdrop, the prosecutor asked individual prospective jurors questions regarding whether their past experiences might affect their "ability to be fair and judge the facts of the case."

> "[PROSPECTIVE JUROR 14]: My sister was shot in Queens last year. Happened near Virginia Tech shooting. She would have front page except the fact the headline.
> "[PROSECUTOR]: That was a random shooting.
> "[PROSPECTIVE JUROR 14]: It was by mentally ill person. Person shot himself afterwards.
> "[PROSECUTOR]: This is sort of a random shooting, as well. There is not going to be any motive presented to you in this case. The defendant is in the back seat of the car on the highway, approached the victim's car and he shot him. Is that going to affect your ability to be fair and impartial, or can you keep that aside?
> "[PROSPECTIVE JUROR 14]: Yes. It won't affect my ability?
> "[PROSECUTOR]: It won't affect your ability.
> "THE COURT: [W]e had talked about this earlier with regard to it. I am sorry for what happened to your sister. I appreciate

your story. You will be able to set aside and listen to the evidence fair and impartially. Is that correct?

"[PROSPECTIVE JUROR 14]: Yes.

"THE COURT: Very good. Thank you. Go ahead."

The prosecutor continued, leading to this exchange with prospective juror 10,

"[PROSECUTOR]: Thank you. Everybody understand my question? Anyone have a similar situation [] with something in your past? Anything in your past? We all share life experiences. We don't come in here with a clean slate. Things have happened to people. Sometimes those past experiences, whether it be work, social things or family functions can sort of change somebody's feelings. There may be something about this case where you say, hey, you know what I can't judge that person fairly. This is not the case for me. There might be another case out there for you. But this isn't it. Just given that, anyone else? Okay. Types of evidence.

"[PROSPECTIVE JUROR 10]: Can I ask you a question?

"[PROSECUTOR]: Sure.

"[PROSPECTIVE JUROR 10]: I think I read about this in the papers.

"[PROSECUTOR]: This case did receive publicity. Go ahead, sir.

"[PROSPECTIVE JUROR 10]:  To be honest with you, I remember reading. Kind of made up my mind then.

"[PROSECUTOR]: Kind of made up your mind then?

"[PROSPECTIVE JUROR 10]: Didn't like the circumstances. I remember reading about it, making a decision kind of in my own head at that time.

"[PROSECUTOR]: You understand it's up to me now to prove to you, beyond a reasonable doubt, who is the actual person that actually did it, right?

"[PROSPECTIVE JUROR 10]: Right.

"[PROSECUTOR]: You might have made up your mind. I believe that was a really bad act. I didn't like the way it happened. Do you understand I have to prove who did it?

"[PROSPECTIVE JUROR 10]: Yes.

"[PROSECUTOR]: I just want to let you know I appreciate your honesty. Don't get me wrong.

"THE COURT: [] let me interrupt you."

The court then addressed the panel and discussed generally how jurors must avoid the influence of media coverage of the crime and cannot predetermine the case, stressing that they must remain fair and impartial. Turning to prospective juror 10, the court sought confirmation that he could abide by these instructions, notwithstanding his reaction to the crime:

> "THE COURT: Folks, one of the instructions you will receive from me, should you be selected, is that if there is any kind of media attention to a case, sometimes it happens where we don't know what is going to happen, sometimes it happens and we do expect it, you cannot let it affect you. You can't listen to it. You cannot watch it on television. You cannot read it on the news. If you are sitting at home and something comes on the TV, you literally will have to change the channel or get out of the room. That's one of the commitments I need from you as jurors. As [prospective juror 10] indicated, he said he made up his mind. That is a bad thing. Obviously, someone was arrested. There's nobody here who is in favor of someone being shot to death in most circumstances. What is important is that it's this defendant who is charged with that crime. The burden lives with [the prosecutor]. That he has to prove that this is the person who did that. Okay? You can remain fair and impartial?
> "[PROSPECTIVE JUROR 10]: I hope so.
> THE COURT: Back on that plane now.
> "[PROSPECTIVE JUROR 10]: I'm not sure.
> "THE COURT: Okay. Thank you, sir.
> "[PROSPECTIVE JUROR 10]: I'm not sure."

After this exchange, the prosecutor asked prospective juror 10 several more questions about his ability to follow the law (he said he could), his family relations with his uncle and cousin who were police captains in Puerto Rico (he answered that he did not discuss cases with them), and his interactions with the criminal justice system arising from a marijuana possession charge that led to a community service sentence. As to this final

issue, when asked by the prosecutor if he was treated fairly by the police, prospective juror 10 said yes, except for his arrest, and in response to a follow up question as to whether he was angry with the police or the district attorney's office over this past experience, he answered no. Then, when the prosecutor contrasted prospective juror 10 to another prospective juror who said they were "likely to give police officers a little bit more credibility," prospective juror 10 responded that he would judge police officers like anyone else.

For his part, defense counsel did not explore with prospective juror 10 his statements that he was not sure he could be impartial, nor did counsel ask whether he could put aside his emotional reaction to the case. Instead, counsel mostly posed general questions to the entire panel of prospective jurors, with the members responding as a group. For example, counsel asked the prospective jurors questions focusing on whether they understood the presumption of innocence; whether they could acquit a defendant if the proof simply was not there; and whether they could be the lone holdout if they truly believed that defendant deserved to be acquitted. In some instances, after posing a general question to the group, defense counsel randomly called on individual jurors and asked for their answers to the general question. With few exceptions—none involving prospective juror 10—counsel did not focus on individual juror circumstances. As for the few questions posed to individual jurors, they focused on whether the prospective jurors believed and understood that witnesses might lie on the stand; whether they could honor defendant's Fifth Amendment right to refrain from testifying; and whether anyone with military experience had specialized training on handguns. Aside from the questions focusing on individuals

with military training, defense counsel appeared to pose his individual questions randomly, with the objective of making general points to the group about defendant's trial rights and witness credibility. In other words, defense counsel was "educating" potential jurors and setting the stage for the defense.

At the conclusion of voir dire, the court sua sponte identified seven persons, including prospective juror 14, for dismissal on consent. Counsel and the prosecutor agreed. Neither side sought to challenge any of the remaining members of the panel for cause and each used three peremptory challenges. At the end of jury selection, counsel had used nine of his allotted 20 peremptory challenges.[3] Defense counsel did not challenge prospective juror 10 who was sworn in and deliberated to verdict.

## C. Verdict and Appeal

The jury convicted defendant of second-degree murder—depraved indifference murder (Penal Law § 125.25 [2]).[4] The Appellate Division affirmed the judgment and, as relevant to this appeal, rejected defendant's claim that his counsel was ineffective for failing to challenge prospective juror 10 (165 AD3d 1173, 1174 [2d Dept 2018]). The court concluded that defendant presented a mixed claim of ineffective assistance, in that it was based in part on matters outside the record, and that the claim would be best resolved in a CPL 440.10 proceeding. A Judge of this Court granted defendant leave to appeal (32 NY3d

---

[3] This total does not include a peremptory strike that counsel exercised and then withdrew during the third and final round of voir dire.

[4] The court submitted only two charges for the jury's consideration, both depraved indifference and second-degree manslaughter, instructing the jury to not consider manslaughter if it found defendant guilty of depraved indifference.

1174 [2019]).  I disagree with the majority adoption of the Appellate Division's view that defendant's claim is unreviewable on direct appeal because "the proper mechanism for the litigation of the claim" is a CPL 440.10 motion (majority op at 13).  Instead, I would reverse and order a new trial because the record establishes that counsel's failure to challenge prospective juror 10 was reversible error.[5]

## II.

### A.      Ineffective Assistance of Counsel Standard

"The right to effective assistance of counsel in criminal proceedings is guaranteed by the New York and Federal Constitutions" (People v Berroa, 99 NY2d 134, 138 [2002], citing US Const, 6th Amend; NY Const, art I, § 6).  The "state standard for effective assistance of counsel has long been whether the defendant was afforded 'meaningful representation'" (id. at 138 [internal citations omitted]).  "[O]ur state standard [for ineffective assistance of counsel] thus offers greater protection than the federal test" (People v Caban, 5 NY3d 143, 156 [2005]).  In contrast to the federal test that expressly requires prejudice to defendant, "'prejudice' is examined more generally in the context of whether defendant received meaningful representation," and "the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular

---

[5] Since I conclude that counsel failed to provide meaningful representation based on this error alone, I do not consider defendant's alternative argument that counsel's performance overall was ineffective because he (1) advocated a defense theory that was implausible, as it was belied by the evidence, and (2) inadequately prepared his expert witness.

impact on the outcome of the case" (id.). "Thus, under our State Constitution, even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (Caban, 5 NY3d at 156 [2005]). This Court has stressed that "our legal system is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence" (People v Benevento, 91 NY2d 708, 714 [1998], quoting People v Donovan, 13 NY2d 148, 153-154 [1963]). In addition to establishing a lack of meaningful representation, a defendant must "demonstrate the absence of strategic or other legitimate explanations for counsel's failure[s]" (People v Rivera, 71 NY2d 705, 709 [1988]).

The United States Supreme Court has held that the Sixth Amendment's definition of effective assistance of counsel "relies . . . on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions" (Strickland, 466 US at 688, citing Michel v Louisiana, 350 US 91, 100-101 [1955]; see also Padilla v Kentucky, 559 US 356, 366 [2010] ["The first prong (of the Strickland test)—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community"]). After all, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms" (Strickland, 466 US at 688). Similarly, in New York, performance standards have been recognized as "highly relevant in assuring that constitutionally effective assistance is provided and in judging whether in a particular case an attorney's performance has been deficient" (Hurrell-Harring v State of NY, 15 NY3d 8, 18 [2010]). The ABA Criminal Justice Standards for the Defense Function imposes upon

defense counsel a broad duty to "be aware of legal standards that govern the selection of jurors, and be prepared to discharge effectively the defense function in the selection of the jury, including . . . exercising challenges for cause and peremptory challenges" (ABA Standards for Criminal Justice, Defense Function, Standard 4-7.3 [a] [4th ed 2017]; see also id. Standard 4-1.2 [c]).

Significantly, as concerns this appeal, "[a] single error may qualify as ineffective assistance, but only when the error is sufficiently egregious and prejudicial as to compromise a defendant's right to a fair trial" (Caban, 5 NY3d at 152 [internal citations omitted]). "To rise to that level, the omission must typically involve an issue that is so clear-cut and dispositive that no reasonable defense counsel would have failed to assert it, and it must be evident that the decision to forgo the contention could not have been grounded in a legitimate trial strategy" (People v McGee, 20 NY3d 513, 518 [2013]). A violation of a right so central to our system of justice as the right to an impartial jury is the type of single error that meets the standard and warrants reversal (see People v Harris, 26 NY3d 321, 327-328 [2015]; Virgil v Dretke, 446 F3d 598, 607 [5th Cir 2006]; Miller v Webb, 385 F3d 666, 676-677 [6th Cir 2004]; United States v Gonzalez, 214 F3d 1109, 1111 [9th Cir 2000]; Johnson v Armontrout, 961 F2d 748, 756 [8th Cir 1992]; Burton v Johnson, 948 F2d 1150, 1155 [10th Cir 1991]; Coleman v Kemp, 778 F2d 1487, 1540, n 24 [11th Cir 1985]; Cooks v United States, 461 F2d 530, 532 [5th Cir 1972]; cf. Nelson v Estelle, 642 F2d 903, 907 [5th Cir 1981] [stating that the Fifth Circuit's single-error jurisprudence has consistently found counsel to be ineffective when the error in question violated a separate constitutional right of the defendant]).

B.      Defendant's Right to an Impartial Jury and Trial Counsel's Error

"'[Nothing] is more basic to the criminal process than the right of an accused to a trial by an impartial jury'" (Torpey, 63 NY2d at 365, quoting People v Branch, 46 NY2d 645, 651 [1979]; see also NY Const, art I, § 2).  CPL 270.20(1)(b) provides that "[a] challenge for cause is an objection to a prospective juror and may be made only on the ground that . . . [a prospective juror has] a state of mind that is likely to preclude [the prospective juror] from rendering an impartial verdict based upon the evidence adduced at the trial."  "Upon such a challenge [under CPL 270.20(1)(b)], a [prospective] juror who has revealed doubt, because of prior knowledge or opinion, about [their] ability to serve impartially must be excused unless the[y] state[] unequivocally on the record that [they] can be fair" (People v Arnold, 96 NY2d 358, 362 [2001]; see also People v Warrington, 28 NY3d 1116, 1119-1120 [2016]; People v Harris, 19 NY3d 679, 685 [2012]; People v Johnson, 94 NY2d 600, 616 [2000]).

"Prospective jurors who make statements that cast serious doubt on their ability to render an impartial verdict, and who have given less-than-unequivocal assurances of impartiality, must be excused" (Arnold, 96 NY2d at 363, citing People v Blyden, 55 NY2d 73, 78 [1982]; Torpey, 63 NY2d at 367; see also Johnson, 94 NY2d at 612).  "By contrast, where prospective jurors unambiguously state that, despite preexisting opinions that might indicate bias, they will decide the case impartially and based on the evidence, the trial court has discretion to deny the challenge for cause if it determines that the juror's promise to be impartial is credible" (Arnold, 96 NY2d at 363, citing People v Williams, 63 NY2d 882,

884 [1984]).  "[T]he principle is a simple one. . . .When a potential jurors themselves say they question or doubt they can be fair in the case, Trial Judges should either elicit some unequivocal assurance of their ability to be impartial when that is appropriate, or excuse the juror when that is appropriate" (Johnson, 94 NY2d at 616).

Given a defendant's basic right to an impartial jury, and trial counsel's professional obligation to protect that right, trial counsel's representation cannot be meaningful when counsel fails to challenge a biased juror (People v Claudio, 83 NY2d 76, 79-80 [1993]; Torpey, 63 NY2d at 365; Virgil, 446 F3d at 613; Miller, 385 F3d at 676-677; Hughes v United States, 258 F3d 453, 463-464 [6th Cir 2001]; Johnson, 961 F2d at 755-756).

Prospective juror 10 demonstrated bias based on his emotional reaction to the crime. During the prosecutor's questioning about whether prior experiences would affect any prospective juror's ability to be impartial and after prospective juror 14 responded, prospective juror 10 affirmatively volunteered his doubts about his ability to be impartial. He stated that he "kind of made up [his] mind" and "ma[de] a decision kind of in [his] own head at that time" based on what he read about the crime prior to the trial because he "didn't like the circumstances."  Given the context of the prosecutor's questioning, and that prospective juror 10 was referring to what he had read about the murder, he was expressing his emotional reaction to the crime and whether he could be unbiased towards defendant. And that is exactly how the prosecutor and court understood these statements.  Both described prospective juror 10 as having believed the murder was a "bad act."  And because prospective juror 10 viewed the murder as a terrible act, he was expressing that he was biased against a defendant accused of the heinous crime.

The statements were sufficiently alarming that the court interrupted the prosecutor's voir dire of prospective juror 10 to address the entire panel informing them that jurors must avoid all news about the case. To emphasize the need to avoid the media's potential influence, the court noted that prospective juror 10 "said he made up his mind" about the crime, and that such a predisposition was a "bad thing." But the court explained that "what is important is that it's this defendant who is charged with that crime" and that the prosecutor "has to prove that this is the person who did it." On the heels of this cautionary comment, the court then asked prospective juror 10 directly whether he could "remain fair and impartial." Prospective juror 10 responded, "I hope so." Since that was the exact type of indefinite statement the court could not accept, the court again pressed on this point. The court returned to its earlier metaphor about the pilot who announces to the passengers that they are about to land the plane and gives an insufficient answer of "I think I can do this." Then, the court point blank rhetorically said to prospective juror 10, "back on that plane now." To this, prospective juror 10 twice responded, "I'm not sure." Tellingly, he repeated the response notwithstanding the court's reminder to him and the rest of the panel just moments earlier that such an answer was "unacceptable." Prospective juror 10 never disavowed these statements.[6]

---

[6] Contrary to the majority's mischaracterization, I have not engaged in fact finding by footnoting, as background, citations to publicity of the crime (majority op at 9 n 1; dissenting op at 3-4 n 1, 4 n 2). I base my legal analysis on constitutional doctrine, controlling precedent and on the record of what counsel did and did not do and what prospective juror 10 actually said. Unlike the majority, I do not speculate or fathom an alternative meaning from the prospective juror's sworn statements that he could not be sure he would be impartial; I take those words for their obvious and intended meaning.

The majority's reading of the record as merely reflecting a general preconceived discomfort with the case (majority op at 8-9) ignores that the point of his responses was that he could not be fair and impartial because of his view of the case, such that he could not judge defendant fairly. Prospective juror 10 was not making an abstract point about his ability to serve, somehow detached from the realities of the case and that defendant was charged with killing another human being. Put another way, the exchange with the prosecutor and the court undoubtedly shows that he was biased against the defendant as the person accused of committing the crime. Moreover, although "[e]motions are natural human responses and the law does not expect jurors to be devoid of such feelings[], jurors must have the capacity and the will to decide the case based solely on the facts as they find them and the applicable law as instructed by the court" (People v Spencer, 29 NY3d 302, 311-12 [2017]; see also People v Reyes, 94 NY2d 600, 615 [2000]; People v Rodriguez, 71 NY2d 214, 216-217, 220-221 [1988]; Arnold, 96 NY2d at 363). Thus, a prospective juror does not need to "'be totally ignorant of the facts and issues involved,'" and may have "'formed some impression or opinion as to the merits'" (majority op at 8, quoting Irvin v Dowd, 366 US 717, 722-723 [1961]), but a person cannot serve if they fail to state that they can decide the case fairly, notwithstanding their emotional reaction to the crime.

Nor is there legal or record support for the majority's suggestion that because the statements were made early in voir dire, they are somehow less significant or should be given less credence than if they had been made minutes later (majority op at 10). The statements responded to fundamental and direct questions about prospective juror 10's

ability to fairly evaluate the evidence in defendant's prosecution. Whether made at the beginning, middle or end of voir dire, the inability of prospective juror 10 to make plain his impartiality with an unequivocal assurance that he would judge defendant fairly is what matters here.

To prospective juror 10's credit, he was candid about his uncertainty to be fair and impartial—so candid that he initiated the questioning on this very subject with the prosecutor. And that makes all the difference because the prospective juror—the only person to know what he heard about the case, to fully appreciate what he was feeling before and during voir dire, and to know how these feelings impacted his ability to serve, given the court's clarity about the need for definitive statements—assessed his impartiality and concluded he was simply not sure he could be fair in this case towards this defendant. Since neither the court nor defense counsel secured an unequivocal statement that he could be unbiased, counsel should have challenged him for cause. Under our case law, the court should have granted the challenge (see, e.g., Arnold, 96 NY2d at 362-63, 368). Counsel's failure resulted in the seating of a biased juror, thus denying defendant his basic right to an impartial jury (see Johnson, 94 NY2d at 614-16 [also resolving Reyes]).

Counsel could not have allowed prospective juror 10 to be seated knowing his bias but hoping that trial evidence would somehow supplant his views or that he would "bend over backwards" to be fair because he was cognizant of his bias, as the People suggest. Who would want their liberty in the hands of a person who says they heard about the case, kind of made up their mind based on what they had read because they did not like the circumstances, and then admits they are not sure they can be impartial and fair? Who wants

a juror who, at most, can only say they "hope" they can meet this essential requirement for

jury service?

III.

No Strategic Reason to Accept a Potentially Biased Juror

The Sixth Circuit in Miller explained, as a federal constitutional matter, "whether

to seat a biased juror cannot be a discretionary or strategic decision" that effective counsel

is permitted to make under the Sixth Amendment (385 F3d at 675).[7] So too under our case

---

[7] The majority attempts to distinguish Miller because in that case there was an evidentiary hearing and counsel provided reasons for keeping the juror in question on the jury (majority op at 9 n 2). However, that specific procedural posture does not render Miller's constitutional analysis any less significant or instructive. The majority ignores that the Sixth Circuit expressly held counsel's failure to challenge a biased juror is inexcusable precisely because there is "no sound trial strategy that could support what is essentially a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury" (385 F3d at 676). As in Miller, the record here is sufficient to decide defendant's claim (see dissenting op at 13-17). No additional evidentiary inquiry is necessary because counsel has no excuse for permitting the seating of a juror who says they cannot be sure they will be impartial. In any case, the Sixth Circuit's discussion of why counsel's strategy was unreasonable in Miller, although dicta, supports defendant's ineffectiveness claim here. The Sixth Circuit explained that counsel made baseless and unreasonable assumptions given the juror's express statements, which counsel failed to explore. Here, too, counsel failed to ask necessary follow-up questions directly to prospective juror 10 once he made statements revealing his predisposition and bias (dissenting op at 8-9, 17).

Similarly, the majority tries to distinguish Hughes v United States (258 F3d 453 [6th Cir 2001]) on the ground that the Sixth Circuit "relied largely on counsel's and the trial court's complete failure to ask her any follow-up questions in holding that the juror was actually biased and counsel was ineffective," which was not the case here (majority op at 9 n 2). However, as discussed *supra*, the record shows that the court asked prospective juror 10 additional questions about his ability to be fair and impartial after the initial exchange with the prosecutor, but the court did not secure an assurance of impartiality and instead, prospective juror 10 said twice that he was not sure if he could be fair. Defense counsel also only asked generalized questions to the entire panel, never directly and individually questioning prospective juror 10 about his bias (see dissenting op at 8-9, 17). In Hughes, the Sixth Circuit expressly admonished such follow-up questioning, holding that a prospective juror's "silence in the face of generalized questioning of

law, such a choice does not meet an objective standard of reasonableness (People v Rivera, 45 AD3d 1249, 1251 [4th Dept 2007]; see also People v Turner, 5 NY3d 476, 485 [2005]; People v Rodriguez, 71 NY2d 214, 220-221 [1988] [stating that where sworn juror showed clear bias against the defendant, discharge of said juror as "grossly unqualified" is mandatory under CPL 270.35 to ensure defendant's constitutional rights]; People v Spencer, 29 NY3d 302, 311-312 [2017] [noting that a sworn juror possessing a state of mind making them incapable of rendering an impartial verdict must be discharged as "grossly unqualified"]). Thus, the People's argument that counsel may have had a strategic reason for not challenging prospective juror 10, leading to his service on the jury, is irrelevant to the analysis.

Even if counsel's strategy were a valid consideration when a defendant claims that the prospective juror was biased, the proposed strategy must nonetheless be reasonable or legitimate (Benevento, 91 NY2d at 712-713; People v Taylor, 1 NY3d 174, 177 [2003];

---

venirepersons by counsel and the court d[oes] not constitute an assurance of impartiality" (258 F3d at 461). And "[b]ecause the district court failed to respond to [the prospective juror's] express admission of bias on voir dire, . . . counsel's failure to respond in turn was objectively unreasonable under Strickland," making a new trial necessary (id. at 462, 463). Applied here, since the trial court's follow up questions did not secure an adequate assurance of impartiality, defense counsel's failure to directly question prospective juror 10 about his statements to ensure he could be unbiased, or to challenge him for cause when such an assurance was lacking was objectively unreasonable under Strickland. Like in Hughes, prospective juror 10 "offered no assurances [up]on which" this Court may rely to find a lack of actual bias and, for federal purposes, prejudice (id. at 460). As such, a new trial is warranted.

Miller, 385 F3d at 676).  Baseless hypotheticals about what defense counsel might have thought are insufficient as a matter of law.

Here, no reasonable trial strategy is discernable, as made plain by the unpersuasive and speculative strategies posited by the People.[8]  I address them in turn.

The People's first argument, that defense counsel may have believed prospective juror 10's marijuana arrest by the NYPD made him more willing to accept defendant's assertion that the police failed to fully investigate the crime and wrongly arrested defendant, is unpersuasive.  Prospective juror 10 admitted the arrest was no longer an issue, and of course, prospective juror 10 had relatives who were out-of-state police captains. Nothing he said suggests he bore ill feelings towards police officers in general.  Thus, there was no basis to presume he would be likely to view the officers' actions in defendant's case with suspicion.  Counsel would also have to have discounted prospective juror 10's response to the prosecutor that he would indeed evaluate the police testimony like anyone else, without favoritism one way or the other.  In any case, prospective juror 10's statement

---

[8] Although it does not change the analysis, because counsel may be ineffective for affirmatively choosing a biased juror or for simply forgetting to challenge a prospective juror, there is no support to conclude, as the majority does, that counsel may have wanted prospective juror 10 to serve on the jury (majority op at 12).  To the contrary, the record suggests he made a mistake by simply losing track of prospective juror 10 and either forgetting to follow up with him or strike him.  Indeed, defense counsel was confused about how prospective jurors responded to voir dire questioning, as shown by counsel's initial objection to dismissal of prospective juror 15 as biased when such was proposed by the court.  The court and the prosecutor had to remind defense counsel that prospective juror 15 stated she could not follow the judge's instructions or the law about depraved indifference murder and that she could not be fair.  After this, defense counsel admitted on the record that his law assistant had to inform him of prospective juror 15's inadequate answers.

about how he was treated by the police was not wholly favorable to the defendant. Prospective juror 10 stated he felt he was treated fairly except for his arrest and said nothing about a police investigation. Indeed, he agreed with the prosecutor's statement that he was not angry about the past.

Moreover, the defense theory of the case was that the victim did not die from the gunshot from a passing car but at the hand of someone else. This defense required the jury to fail to credit every nonpolice witness about the events leading up to and following the shooting that supported the People's version that defendant fatally shot the victim. Since the key witnesses were the riders in the two cars, the juror would not only have to accept that the police investigation was flawed and possibly a coverup, but also that the riders, including defendant's friend, were lying. A highly improbable scenario, both because the jury would have to accept that these witnesses perjured themselves to present a web of lies, and also because defendant's expert testified the bullet recovered from the car could have been shot from a revolver, which the People argued was the gun used by defendant. Given this high burden, counsel needed jurors who would reject the People's version of events by distrusting every single witness for the prosecution—jurors who could set aside emotion and sympathy for the victim and the victim's family. As described above, nothing about prospective juror 10's prior interaction with the criminal justice system showed he was the type of juror defense counsel wanted or needed. Notably, prospective juror 10 was prosecuted for marijuana possession and was sentenced to community service, and nothing in his statements showed he would be sympathetic to defendant, who was on trial for a murder. Further, prospective juror 10's statements show he had made up his mind about

"the circumstances" of the victim's death, and his assurance that he understood that the prosecutor had to prove *who* shot the victim from the passing car does little to overcome his bias. In other words, prospective juror 10 had made up his mind about the merits of defendant's substantive defense, making him a poor juror choice for the defense.

Second, the People argue prospective juror 10's statement, "if it's a good case, I'll go by the law" on the depraved indifference murder charge, suggested he would acquit defendant unless there was a good case. But that statement was not about the ability to be impartial towards the defendant. Rather, the answer was given in response to the prosecutor's inquiry to this first panel of prospective jurors about whether they could render a decision on depraved indifference even though it is not intentional murder, exploring whether anyone thought it would be unfair to punish both crimes the same way, such that the prospective juror "can't follow the law." Prospective juror 10's statement that he would go by the law and convict if it was a good case meant only that he would be able to convict on murder in the second degree; it did not clarify what he meant by a "good case" or whether he would consider pre-trial information in making that assessment. In any event, these statements do not satisfy our legal requirement that a prospective juror expressly disavow bias or overcome his prior statements that he was not sure he could be fair and impartial. Even more logically incongruous, because counsel never made inquiries to remove the cloud of doubt as to prospective juror 10's impartiality, counsel would have had to conclude that prospective juror 10 was not truthful about his inability to be impartial in order to find him an acceptable choice. But then, why believe anything else he says that would have, according to the People, made him attractive to the defense?

Third, the People argue that prospective juror 10 could have been one of those jurors who said they would be willing to acquit defendant if there were lack of proof when defense counsel asked four jurors individually that question. In the same vein, the People's fourth argument is that prospective juror 10 apparently responded appropriately during the group questions by defense counsel, including when asked if they would be willing to be the lone person to hold out for acquittal. Those who did not say they would were then dismissed on consent. However, the Court has made clear that a group response of adherence to the court's instructions is insufficient (Arnold, 96 NY2d at 363-364). The reason is clear:

> "[t]he group answer by the entire panel did not address [his] personal attitudes, nor did it force [him] to confront the crucial question whether [he] could be fair to this defendant in light of [his] expressed predisposition. Indeed, nothing less than a personal, unequivocal assurance of impartiality can cure a juror's prior indication that [they are] predisposed against a particular defendant or particular type of case" (id. at 363-64).

The bottom line is that prospective juror 10 had to individually, unequivocally state that he would be unbiased, but he never did.

Significantly, neither counsel nor the judge secured an assurance of impartiality by any variety of questioning. For example, "[t]hey did not ask whether [he] could 'lay aside [(his) feelings] and render a verdict based on the evidence presented in court" (Miller, 385 F3d at 675, quoting Irvin, 366 US at 722-723).

Even assuming prospective juror 10 responded to counsel's questioning by agreeing to acquit if there was a lack of proof, this did not confirm how prospective juror 10 would consider the proof. And counsel could not rely on prospective juror 10 having stated earlier that he hoped he could be fair. Our law requires more than mere aspiration towards

unbiased consideration of the evidence and a defendant's guilt.  Given his prior statements to the court and the prosecutor, an individual inquiry was the only way to ensure that prospective juror 10 was not predisposed against defendant.  Put another way, it is one thing for a prospective juror to say that they think they can be fair since, in and of itself, that statement might not be sufficient to establish bias, but that is not what happened here.  Instead, prospective juror 10 said he did not know if he could be fair.  That equivocation is a statement of partiality, unacceptable as a matter of law (see Warrington, 28 NY3d at 1117-1119, 1120 [2016]; Torpey, 63 NY2d at 364, 369 [1984]; Blyden, 55 NY2d at 78-79).

To the extent the People support these arguments by claiming prospective juror 10's demeanor may have convinced defense counsel not to challenge prospective juror 10, a generalized claim of "demeanor" cannot be the basis of a reasonable and legitimate strategy on this record.  We have never held that demeanor on its own is enough to overcome asserted bias.[9]  Here, no physical movement could have overcome this prospective juror

---

[9] The People's reliance on People v Barboni (21 NY3d 393 [2013]) and People v Thompson (21 NY3d 555 [2013]) is misplaced, as neither depended solely on speculation about demeanor.  The respective records in those appeals established other reasons why defense counsel might find the prospective juror potentially attractive to the defense.  In Barboni, the prospective juror's possible favorable assessment of police testimony did not implicate the defense theory (21 NY3d at 406).  Although here, defendant challenged the credibility of the police officers, that line of defense would only have succeeded if the jury disbelieved every other witness for the People, and for the reasons I have discussed, nothing during jury selection suggested prospective juror 10 would be open to not crediting these other witnesses.  In Thompson, the prospective juror expressly averred that his relationship with the prosecuting lawyer would not affect his ability to be fair and impartial.  While it may have been "an unconventional, perhaps risky choice" (id. at 560) to accept prospective juror 10 if he had subsequently asserted his impartiality, it is ineffective assistance to accept prospective juror 10 without any such affirmance.  Here, of course, prospective juror 10

saying he could not be sure of his ability to be fair and only hoped he could be fair and impartial. Using the trial court's metaphor, no one would get on a plane with a pilot who is not able to confirm they can fly the plane; no defendant should have to stand trial with a juror who is not able to confirm they can be fair.

Certainly, jury selection involves counsel making decisions based on observations, looking a prospective juror in the eye, measuring an individual based on how they react to the colloquy as well as what is heard.[10] But that misses the point of whether a court should refuse to review an ineffective assistance of counsel claim based solely on some unknown measure of demeanor when the prospective juror's record statements evince bias and show uncertainty in the prospective juror's ability to be fair and impartial towards the person charged with the crime. Lawyers sometimes make choices during jury selection that may

---

was unable to make such an unequivocal statement when asked several times, and instead responded that he could not state even this most basic assurance.

[10] There is interesting research on jury selection that suggests juror candor in response to voir dire questions depends on a variety of factors, including: who asks the question (judge or attorney); the formation of the question (open or closed); and the tone of the question as it is asked (Catherine M. Grosso and Barbara O'Brien, *Lawyers and Jurors: Interrogating Voir Dire Strategies by Analyzing Conversations*, 16 J Empirical Legal Stud 515, 522-24, 541 [2019]). In one study, scholars found that using open questions and an affective expression, rather than closed questions and less emotionally laden expressions, led to jurors being more open and honest about their true beliefs (id. at 523; see also Kathi Middendorf & James Luginbuhl, *The Value of a Nondirective Voir Dire Style in Jury Selection*, 22 Crim Just & Behav 129, 130-31 [1995]). In follow-up research based on these findings and using Roter Interaction Analysis System coding and time-series sequencing, scholars confirmed "that lawyers to some extent control the quality of the information they obtain from jurors through the structure and tone of their questions" (Grosso and O'Brien, *Lawyers and Jurors*, at 540-41). Other research shows that extra-legal factors concerning jurors, such as perceptions of a defendant's physical attractiveness, social categorization, judicial bias, personality types, attitudes about society, ideology and stress levels, may all influence a juror's decision-making in a case (see generally John W. Clark III, *Essay: Is It Possible To Predict Juror Behavior?*, 5 Tenn J L & Pol'y 199 [2009]).

appear unorthodox or inexplicable, and such choices do not automatically render counsel ineffective. Those choices are based on experience as well as skilled questioning of the panel. However, it is a very different thing to choose a biased juror, or mistakenly fail to challenge a potentially biased prospective juror, without having heard a prospective juror's statement of impartiality.

The People's fifth argument is that since prospective juror 10 had never served on a jury before, he may have been sympathetic to defendant and less likely to convict. If so, his demeanor may have persuaded defense counsel that prospective juror 10 would hold the People to their burden of proof. This argument requires little discussion, as jurors who had served and those who had never served on juries were dismissed on consent of the parties or were peremptoried by both defense counsel and the prosecutor, showing no discernible pattern, especially since the majority of prospective jurors in the first group had never served on a jury before. With respect to prospective juror 10, he had expressly conveyed multiple times that he was a closed-minded juror and so the argument that he may have been more open as a first-time juror is purely speculative. Also, because this was the first round, counsel was not faced with having to choose from a final group of less than ideal prospective jurors. Nor had counsel exhausted his peremptories. As it turned out, he had 11 remaining peremptory challenges at the end of jury selection.

Sixth, the People argue, and the majority finds persuasive (majority op at 11), that defense counsel may have been considering defendant's preferences because the record shows counsel conferred with defendant prior to announcing his peremptory challenges and before informing the court he was done. But the challenge counsel should have made

was based on bias, and when asked by the court if either party had cause challenges for the entire panel, counsel said he had none, without first seeking to confer with defendant. By the time counsel asked to speak with defendant before announcing his peremptories, counsel had made his professional assessment of prospective juror 10 and decided to let this biased juror sit on the jury. That decision deprived defendant of effective assistance of counsel—to which he is constitutionally entitled—and to consideration of his case by an impartial jury—as was his constitutional right.

Despite their misreading of the record, at oral argument, the People acknowledged that jury selection was solely within the province of defense counsel. That is unsurprising since at the time of trial, our case law was clear that "[t]he selection of particular jurors falls within the category of tactical decisions entrusted to counsel, and defendants do not retain a personal veto power over counsel's exercise of professional judgments" (Colon, 90 NY2d at 826, citing People v Sprowal, 84 NY2d 113, 119 [1994]; ABA Standards for Criminal Justice, Defense Function, Standard 4-5.2 [b] [3d ed 1993]). As such, defense counsel understood that he could not defer to defendant on a decision that has been held to be within the power and expert judgment of counsel. In fact, failure to exercise counsel's professional judgment is a deprivation of "the expert judgment of counsel to which the Sixth Amendment entitles [a defendant]" (People v Colville, 20 NY3d 20, 32 [2012]; see also People v Lopez-Mendoza, 33 NY3d 565, 574 [2019]; People v Hogan, 26 NY3d 779, 786 [2016]). Since whether to challenge prospective juror 10 was a strategic decision that defense counsel was entitled to make and about which counsel was required to exercise his professional judgment, defense counsel should have explored with prospective juror 10 his

stated bias. Having failed to do so and without any statement that prospective juror 10 was able to be fair and impartial, counsel should have challenged prospective juror 10 for cause or exercised a peremptory strike. Under our law at the time, deferring to defendant's request to accept prospective juror 10 against counsel's professional judgment, if that were the case, would have rendered counsel ineffective.

Finally, the People contend that even under our State's ineffective assistance of counsel standard, defendant was required to show that he was prejudiced by prospective juror 10's presence on the jury, relying on Thompson (21 NY3d at 560). This argument fundamentally misunderstands how New York's ineffective assistance of counsel standard differs from the federal one as defined in Strickland (466 US at 668-94), namely that a showing of prejudice is not required to make out a successful ineffective assistance of counsel claim under New York law (People v Stultz, 2 NY3d 277, 284 [2004]). Moreover, the potentially biased juror in Thompson unequivocally stated that he could be fair and impartial, which explains why the Court rejected the defendant's ineffective assistance of counsel claim partially on the ground that the record failed to show how that juror's presence on the jury impacted the defendant (21 NY3d at 560). In any event, prejudice flows from the seating of a biased juror and in such case, deprivation of a fair and impartial jury is both obvious and presumed (Torpey, 63 NY2d at 366; see also People v Branch, 46 NY2d 645, 651-652 [1979]). Thus, under both the federal and state constitutional standards, counsel was ineffective.

IV.

The majority has essentially adopted a per se rule that ineffective assistance of counsel claims must be considered by way of a CPL 440.10 motion.[11]  We have never adopted such an inflexible rule and there is no reason to do so now.[12]  Whether an ineffective assistance of counsel claim may be decided on direct appeal based on the record before the appellate court is a case by case determination.  When, as here, there is no on-the-record explanation by counsel for the choices made during jury selection, but the record fails to establish a prospective juror's core qualification for jury service (i.e. the ability to be fair and impartial) and counsel does not explore a prospective juror's statements of potential bias, then no lawyer's explanation can suffice.

---

[11] It may not be obvious from the majority's discussion of the origins of coram nobis and the legislative purpose of CPL 440.10, but defendant does not suggest we have misunderstood either, nor does he argue that all ineffective assistance of counsel claims must be decided on direct appeal.  He maintains, as this Court has held, that where the record on direct appeal is adequate, an appellate court may not avoid consideration of the merits of such claim (see People v Yavru-Sakuk, 98 NY2d 56, 59-62 [2002]; People v Bachert, 69 NY2d 593, 597-600 [1987]; see, e.g., People v McDonald, 68 NY2d 1, 9-12 [1986]; see also Lopez-Mendoza, 33 NY3d at 572-573; People v McLean, 15 NY3d 117, 121 [2010]).  He simply persuasively argues that the record here presents such a case.

[12] It is worth nothing the majority's approach imposes particularly harsh consequences for indigent defendants, as there is no right to assigned counsel on a CPL 440 motion.  Yet, challenges to a counsel's effectiveness are the types of claims that require the trained eye of another attorney.  While it may be difficult even for an attorney to secure from trial counsel information that supports claims of a failed trial strategy, such is tenfold more difficult for a lay defendant, incarcerated with limited to no financial resources.  The majority would render such claims effectively beyond judicial review.

The record on direct appeal establishes that counsel provided less than meaningful representation by failing to challenge a biased prospective juror. Defendant is entitled to a new trial before an impartial jury. I dissent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed. Opinion by Chief Judge DiFiore. Judges Stein, Fahey, Garcia, Wilson and Feinman concur. Judge Rivera dissents and votes to reverse and order a new trial in an opinion.

Decided May 7, 2020